## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

MRG CONSTRUCTION CORP.,

        Plaintiff,

        v.                        CASE NO. 3:23-CV-241-MGG

CBS Service, LLC

        Defendant.

## OPINION AND ORDER

Pending before the Court is Plaintiff's motion for partial summary judgment.

[DE 21].[1] For the reasons discussed below, the motion is denied.

## I. Background

### A.  Material Facts[2]

On April 27, 2022, Plaintiff MRG Construction Corp., as general contractor, and

Defendant CBS Service, LLC, as subcontractor, entered into an agreement ("the

---

[1] The parties consented to have a magistrate judge hear and decide the case, and, on June 5, 2023, the matter was referred to the undersigned for all further proceedings and the entry of judgment. [DE 11].

[2] For purposes of Plaintiff's motion, the Court considers the undisputed facts as shown by the "Statement Of Undisputed Material Facts In Support Of Plaintiff's Motion For Summary Judgment" (hereinafter "Plaintiff's Fact Statement") [DE 21-2], and the "Response To Plaintiff's Statement Of Material Facts" (hereafter "Response to Plaintiff's Fact Statement") [DE 25]. In addition, the Court considers the facts set forth in Defendant's Additional Material Facts portion of its Response to Plaintiff's Fact Statement [DE 25 at 5-10]. *See* N.D. Ind. L.R. 56-1(b). Because the evidence, including all reasonable inferences, must be considered in a light most favorable to the nonmoving party, *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000), the Court will consider Defendant's additional material facts even if they are disputed. The Court notes, however, that Plaintiff did not file any reply to Defendant's Additional Material Facts. *See* N.D. Ind. L.R. 56-1(c)(2). As a result, Defendant's Additional Material Facts could also be treated as undisputed for present purposes. *See* Fed. R. Civ. P. 56(e) ("If a party ... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ....").

Subcontract") by which CBS agreed to furnish and install all necessary electrical equipment for MRG's Range USA project in Mishawaka, Indiana ("the Project"). *See* [DE 24-1 at 1 (Smith Decl. ¶ 4); DE 4 at 6-23 (Subcontract)]. When CBS bid on the Project, MRG represented that construction would begin in late April 2022; the electrical work would be completed by October 2022; and construction on the whole Project would be completed by the Fall of 2022. [*Id.* at 2 (Smith Decl. ¶ 7)]. The only timing provision in the Subcontract itself, however, is paragraph 3.1, which states that CBS's work "shall be commenced not later than 4/26/22, and, subject to authorized adjustments, shall be substantially completed as per schedule approved by Contractor, Architect, and Owner." [DE 4 at 7 (Subcontract, ¶ 3.1)].

Despite the reference to a schedule in paragraph 3.1, no schedule for the Project was included in the Subcontract. [DE 24-1 at 2 (Smith Decl. ¶ 10)]. Instead, after the parties signed the Subcontract, MRG provided CBS with an Adjusted Schedule for the Project, which outlined the start dates and finish dates for all work to be performed on the Project. [*Id.* (Smith Decl. ¶ 11); *see id.* at 25-28 (Def. Ex. 2, Adjusted Schedule)]. Pursuant to the Adjusted Schedule, structural work on the Project (the "Structural Work"[3]) was to begin on May 16, 2022, and be completed by June 16, 2022. [*Id.* at 3 (Smith Decl. ¶ 15)]. Work to complete the building structure for the Project (the "Building Work"[4]) was to begin once the Structural Work was completed and was to be

---

[3] Structural Work included digging foundations, pouring footings, installing the building foundation, and roughing in underground electrical and plumbing. [DE 24-1 at 3 (Smith Decl. ¶ 15)].

[4] Building Work included installing external and internal masonry walls and structural steel in the building. [DE 24-1 at 3 (Smith Decl. ¶ 17)].

finished on August 30, 2022. [*Id.* (Smith Decl. ¶¶ 17, 18)]. CBS could not perform the rough in electrical work[5] or the final trim electrical work[6] until after the Building Work was completed. [*Id.* (Smith Decl. ¶ 19)]. Accordingly, the Adjusted Schedule set the start date for CBS's rough in electrical work on August 31, 2022, with that work to be completed about October 4, 2022. It provided for the final trim electrical work to begin on October 5, 2022, and completed on October 17, 2022. [*Id.* at 3-4 (Smith Decl. ¶¶ 20, 23)]. The Adjusted Schedule provided that the Project was to be fully completed, closed out, and turned over to the owner on November 4, 2022. [*Id.* at 3 (Smith Decl. ¶ 14)].

CBS completed the structural related electrical work "per the [Adjusted] [S]chedule," which would have been sometime between May 16, 2022, and June 16, 2022. [*Id.* at 3 (Smith Decl. ¶¶ 15-16)]. But CBS was not able to begin the remainder of its electrical work on the Project because the Building Work was delayed beyond the stated August 30, 2022, completion date. [*Id.* at 3-4 (Smith Decl. ¶¶ 20-27)]. In fact, the Building Work was still not completed in November 2022, when MRG prepared and delivered a New Schedule to CBS. [*Id.* at 4 (Smith Decl. ¶ 28); *see id.* at 29-36 (Def. Ex. 3, New Schedule)]. Under the New Schedule, the Building Work was to be completed on December 1, 2022, while CBS was to commence and complete its rough in electrical work in December 2022 and its final trim electrical work in early January 2023. [*Id.* (Smith Decl. ¶¶ 30-31)].

---

[5] Rough in electrical work includes laying electrical lines, mounting junction boxes, pulling wiring through wall studs, grounding, and setting up the electrical panel. [DE 24-1 at 3 (Smith Decl. ¶ 19)].

[6] Final trim electrical work includes installing light fixtures, light switches, and receptacles. [DE 24-1 at 3 (Smith Decl. ¶ 19)].

3

In December 2022, CBS informed MRG that it did not have the ability or the manpower to complete the remainder of the electrical work pursuant to the New Schedule, because its electricians were occupied on other jobs in December 2022, and CBS said it could not pull them off those other scheduled jobs, which were on schedule, to accommodate the delays in the Project. [*Id.* at 5 (Smith Decl. ¶ 33)]. Neither party provides the Court with sufficient details concerning what happened next. MRG asserts that CBS "simply decided that it had better places to utilize its electricians and walked off the job leaving MRG to fend for itself." [DE 21-1 at 4]. That assertion is somewhat misleading, however, in light of MRG's own undisputed fact statement, which states in multiple paragraphs that CBS's electricians were all committed on other jobs and CBS did not have the additional manpower for the revised dates in the New Schedule. *See* [DE 21-2 (Plaintiff's Fact Statement, ¶¶ 4, 10, 11, 12)]. In other words, it appears that what MRG means to say is that CBS declined to break any of its other contractual commitments to accommodate MRG's delayed scheduling.

MRG also contends that "CBS never requested an extension nor was it provided an extension of time to complete the work due to an alleged delay in [the] project." [DE 21-2 (Plaintiff's Fact Statement, ¶ 9)]. But the citation MRG provides for this purportedly "undisputed" fact (which CBS denies, *see* [DE 25 at 4 (Response to Plaintiff's Fact Statement, ¶ 9)], only shows that an extension was not granted; the cited

evidence says nothing about whether CBS ever requested an extension.[7] Neither party has submitted sufficient evidence for the Court to determine whether CBS ever requested an extension.[8]

The only additional information before the Court is the declaration testimony of Jeremy Smith, CBS's Director of Operations, concerning how CBS approached the lack of manpower issue when it learned of the New Schedule. According to Smith, "[t]o mitigate potential loss, in December 2022, CBS recommended that MRG cancel the remainder of the Subcontract and contract with another electrician to complete the remainder of the electrical work under the Project." [DE 25-1 at 5 (Smith Decl., ¶ 34)]. CBS explained to MRG that, "due to the Building Work just recently being completed, hiring another electrical contractor to complete the remainder of the electrical work was the most efficient way to move the Project toward completion, based on the New Schedule." [*Id.*]. Apparently MRG did not agree to cancel the Subcontract, as it brought this lawsuit approximately three months later alleging CBS was in breach of the Subcontract by having failed to provide the required electrical services. But MRG does not point to any evidence in the record to show how it responded to CBS's suggestion to cancel the Subcontract, including any additional negotiations or conversations

---

[7] There appears to be no dispute that MRG never gave its written consent to an extension for CBS's electrical work, as provided in the Subcontract. *See* [DE 27-1 at 48 (C. Smith Dep. at 47:2-5); DE 4 at 7 (Subcontract ¶ 3.3)].

[8] CBS cites the declaration testimony submitted with its opposition to MRG's motion, but that testimony only discusses CBS informing MRG that it did not have the ability or the manpower to complete the remainder of the electrical work pursuant to the New Schedule. *See* [DE 25 at 4 (Response to Plaintiff's Fact Statement, ¶ 9 (citing Smith Decl. ¶ 33))]. The declaration does not specifically discuss whether CBS asked for additional time to complete the work.

between the parties following CBS's suggestion, or when and how it declared CBS to be in breach of the Subcontract. Nor has MRG pointed to any evidence regarding whether it hired a substitute electrical contractor to finish the electrical work. *See* [DE 4 at 13, 14 (Subcontract ¶ 12.6.1, ¶ 13.1.1)].[9]

### B.    Present Motion

The operative amended complaint includes two counts. Count I, Breach of Contract, alleges that CBS was contractually obligated but "failed to substantially compete all of the work required by the Contract Documents as per the schedule approved by Contractor, Architect and Owner." [DE 4 ¶ 13]. Count II, Unjust Enrichment, alleges that CBS has been unjustly enriched by virtue of MRG's" overpayment of improperly calculated amounts due for incomplete work, which overpayments were above and beyond amounts actually required by the provisions of the Subcontract." [*Id.* ¶ 18]. MRG currently seeks partial summary judgment in its favor "as to liability under its breach of contract count." [DE 21-1 at 1].

## II.  Discussion

### A.    Standard of Review

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

---

[9] The Court recognizes that the deposition transcript submitted by MRG (of CBS's owner, Cara Smith) may briefly touch upon some of these matters. But MRG has not cited or discussed those portions of the deposition, and it is not the Court's job to parse the record looking for evidence. *See Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("[j]udges are not like pigs, hunting for truffles buried in briefs").

Civ. P. 56(c); *Moore v. Vital Prod. Inc.*, 641 F.3d 253, 256 (7th Cir. 2011); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

B.    **Analysis**

1.    **Piecemeal presentation of a single claim**

Before addressing the parties' arguments, the Court *sua sponte* raises the question

whether partial summary judgment—even though allowed by the rules[10]—is the most

efficient way of proceeding in this case. While "partial summary judgment can serve a

useful brush-clearing function [,] …. a party should not pursue a needlessly piecemeal

litigation strategy." *Hotel 71 Mezz Lender LLC,* 778 F.3d at 606 (internal citations

omitted).

Here, MRG claims to be seeking partial summary judgment on the issue of

liability for breach of contract. But MRG's motion papers do not touch upon an essential

element of its breach of contract claim, which is damages. *See Berg v. Berg,* 170 N.E.3d

224, 231 (Ind. 2021) ("The essential elements of a breach of contract action are the

existence of a contract, the defendant's breach thereof, and damages." (internal

quotation marks and citation omitted)).[11] MRG is actually seeking a ruling only on the

issue of whether CBS *breached* the Subcontract. No *liability* determination can be made

---

[10] *Fed. R. Civ. P. 56(a)* ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); *see Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund,* 778 F.3d 593, 606 (7th Cir. 2015) ("There is no doubt that a court may grant, and a party may seek, summary judgment as to one party or one claim, leaving other claims and other parties to be addressed at a later point in the litigation.").

[11] A federal court sitting in diversity must apply the forum state's choice of law. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *Looper v. Cook Inc.,* 20 F.4th 387, 390 (7th Cir. 2021). The Subcontract provides that it is to be construed according to the laws of Indiana [DE 4 at 14 (Subcontract, Article 14.2)], and this provision is enforceable under Indiana law. *See St. Paul Travelers Cos., Inc. v. Corn Island Shipyard, Inc.,* 437 F. Supp. 2d 837, 842 (S.D. Ind. 2006), *aff'd,* 495 F.3d 376 (7th Cir. 2007); *see also MPACT Constr. Grp., LLC v. Superior Concrete Constructors, Inc.,* 802 N.E.2d 901, 906 n.3 (Ind. 2004) (stating that Indiana law "makes void any provision in 'a contract for the improvement of real estate in Indiana' that 'makes the contract subject to the laws of another state,'" quoting *Ind. Code § 32–28–3–17*).

unless MRG also can show that it was damaged by CBS's breach.[12] MRG need only present "adequate evidence to allow a jury to determine with sufficient certainty that damages in fact occurred," *Shepard*, 463 F.3d at 745, leaving the amount of its damages to be calculated in a separate proceeding. This is obviously not a heavy burden, but MRG has made no attempt in its partial summary judgment motion to satisfy it.[13]

The Subcontract anticipates CBS's nonperformance and provides MRG with a specified remedy: MRG can contract with another subcontractor to finish the work. *See* [DE 4 at 13 (Subcontract ¶ 12.6.1 ("If the Subcontractor defaults or neglects to carry out the Work in accordance with this Agreement and fails within three working days after receipt of written notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may make good such deficiencies and may deduct the cost thereof from the payments then or thereafter due the Subcontractor, ….); *id.* at 14 (Subcontract ¶ 13.1.1 (similar)].[14] [DE 4 at 7 (Subcontract, Article 4)]. Ostensibly, MRG has already paid CBS some portion of the total $315,000 Subcontract price [DE 4 at 7 (Subcontract, Article 4)] for the rough in

---

[12] *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006) ("Under Indiana law, …. [a] mere showing of a breach of contract does not necessarily entitle a plaintiff to damages." (internal quotation marks and citation omitted)); *see also Castillo v. Nationstar Mortg. LLC*, No. 15-CV-01743-BLF, 2016 WL 6873526, at *3 (N.D. Cal. Nov. 22, 2016) (citing *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal. App. 2d 506, 511 (Ct. App. 1967) ("A breach of contract without damage is not actionable.")).

[13] *See, e.g.*, *Invisible Dot, Inc. v. DeDecker*, No. CV1808168RGKRAOX, 2019 WL 7173147, at *7 (C.D. Cal. Oct. 11, 2019) (partial summary judgment on issue of liability for breach of contract claim denied where the plaintiff's motion was silent on the issue of damages; court holds that the plaintiff's acknowledgment that damages remain at issue was insufficient to meet its burden of showing for liability purposes that it was damaged by the purported breach).

[14] Seeking out a replacement electrical contractor is not only MRG's contractual remedy for CBS's nonperformance under the Subcontract, it is also required by the common law rule regarding mitigation of damages. *See Maples Health Care, Inc. v. Firestone Bldg. Prod.*, 162 N.E.3d 518, 530 n.5 (Ind. Ct. App. 2020) ("the non-breaching party to a contract has a duty to mitigate damages that stem from the breach").

underground electrical work CBS completed at the start of the Project. But the remaining amount due under the Subcontract would have been unpaid when CBS allegedly breached the agreement. MRG's damages therefore likely consist of the excess costs it incurred from having to replace CBS as the electrical subcontractor for the Project over the amount saved in not having to pay CBS for its unperformed work on the Project. *See* [DE 4 at 14 (Subcontract ¶ 13.1.1)]. In fact, it is possible that MRG was able to replace CBS with another electrical subcontractor without additional cost to itself. Yet, with no evidence in the record to justify an inference, the Court cannot speculate about the manner in which MRG resolved its subcontractor dilemma.

If MRG was able to cover for CBS's anticipatory breach without incurring additional costs, then that would be a valid basis for entering judgment against MRG on Count I. And such a ruling could be made without ever having to decide what may be the more difficult issue of whether CBS's failure to perform constituted a breach of its duties under the Subcontract. *See, e.g.*, *Toth v. Rich Twp. High Sch. 227*, No. 17 CV 6186, 2021 WL 5759167, at *3 (N.D. Ill. Dec. 3, 2021) (partial motions for summary judgment are "disfavored [if] they result in piecemeal litigation and a waste of judicial resources," and that is more likely to occur "when the partial summary judgment motion does not resolve an entire claim, but rather addresses only a single element"). At the very least, consideration of the damages issue together with the remedy provisions in the Subcontract might shed light on the correct interpretation of the Subcontract provisions regarding the parties' respective rights and responsibilities insofar as the timing issue raised by CBS's defense to its failure to complete the work called for by the Subcontract

is concerned. Therefore, it makes sense that the question of MRG's damages from CBS's alleged breach of contract ought to be considered at the same time as the question of CBS's alleged breach of the contract. In short, a more complete, rather than piecemeal, presentation of MRG's breach of contract claim would likely facilitate the Court's resolution of that claim.[15]

### 2.    Underinclusive and skeletal presentations of arguments

The judicial efficiency concern discussed above is further heightened by the fact that the argument section of MRG's brief in support of its motion consists of only nine sentences and one boilerplate case citation. The single case, moreover, is cited for the proposition that "CBS's liability to MRG 'must be measured by the strict terms of its Contract,'" [DE 21-1 at 3], when the case, *Town of Plainfield v. Paden Eng'g Co., 943 N.E.2d 904 (Ind. Ct. App. 2011)*, actually holds that "[a] *surety's* liability must be measured by the strict terms of his contract." *Id.* at 915 (internal quotation marks and citations omitted). CBS is not a surety, and, even if it was, the "strict" rule of construction applied in *Town of Plainfield* is to interpret the contract terms narrowly *against* a finding of liability--the *opposite* of what MRG seeks here. MRG's reply brief is only slightly better. It discusses this issue in more length but cites no cases and merely asserts in a conclusory manner that the contract provisions cited by CBS in its

---

[15] *See, e.g., Brown v. McKinley Mall, LLC*, No. 15-CV-1044-FPG-LGF, 2018 WL 2289823, at *6 n.8 (W.D.N.Y. May 17, 2018)* (agreeing that "the analysis of the alleged [ADA] violations and proposed solution" should be examined "as a whole," and that "parsing out individual claims" in a "disjointed" manner on a motion for partial summary judgment is ultimately a waste of judicial resources").

opposition unambiguously mean what MRG claims they mean rather than what CBS argues they mean.

The absence of adequate development of the pertinent legal and factual issues becomes more obvious when the potentially applicable contract provisions and legal principles are considered. It is true, as MRG asserts (without citing applicable law), that if the terms of the Subcontract regarding the timing of CBS's performance are clear and unambiguous, the Court can decide that issue as a matter of law.[16] But MRG has not convinced the Court with its skeletal arguments that, insofar as CBS's rights and obligations concerning timing are concerned, the Subcontract's terms are clear or the parties' intentions are apparent.

As a preliminary matter, MRG fails to discuss the specific language of any of the contract provisions on which it relies.[17] Instead, MRG's brief and Plaintiff's Fact Statement obliquely refer to a contractual requirement to obtain an extension of time and paraphrase language from one other provision of the Subcontract, paragraph 21 of the "Quality Assurance Commitment Guidelines" attached to the Subcontract as "Exhibit D," by which CBS agreed to do "whatever is necessary" to "meet the Schedule requirements" if it is unable to properly staff the Project.

The two provisions on which MRG relies state as follows:

---

[16] *See, e.g., Luse Thermal Techs., LLC v. Graycor Indus. Constructors, Inc.,* 221 N.E.3d 701, 714 (Ind. Ct. App. 2023) ("When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made." (internal quotation marks and citations omitted)).

[17] It could be that the specific contract provisions are discussed in more detail in the cited deposition testimony. But "[a] brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record." *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999).

> No extension of time will be valid without the Contractor's written consent after claim made by the Subcontractor no later than forty-eight (48) hours after the commencement of the event or condition causing the delay and in accordance with paragraph 11.2.

[DE 4 at 7 (Subcontract ¶ 3.3)].

> If Subcontractor fails to meet the Schedule requirements as a result of its inability to properly staff and/or provide the needed materials or documents, Subcontractor shall do whatever is necessary to get back on schedule and will work additional hours including but not limited to Weekends and longer days, as well as provide expedited delivery of products to meet the schedule requirements of the project at no expense to the Contractor.

[*Id.* at 23 (Subcontract, Ex. D, ¶ 21)].

Neither of these provisions addresses CBS's argument that MRG breached the Subcontract first by is "chronic delay in completing the Building Work," which "interfered with—and made it impossible for CBS to perform—CBS's electrical work on the Project," thereby excusing CBS from performing the remainder of the contract work. *See* [DE 24 at 8 (citing *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 917 (Ind. Ct. App. 2011)* ("When one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party…."))]. In support of this argument, CBS cites to a number of contract provisions that deal specifically with the timing of CBS's performance under the Subcontract. *See* [DE 24-1 at 2].

To begin with, paragraph 3.1 states that "[t]he work to be performed under this Subcontract shall be commenced not later than 4/26/22 and, subject to authorized adjustments, shall be substantially completed as per schedule approved by Contractor,

13

Architect, and Owner." [DE 4 at 7]. Paragraph 3.2 then states that "[t]ime is of the essence of this Subcontract." [*Id.*]. In addition, paragraph 12.2.1 imposes a duty on MRG to "cooperate with the Subcontractor in scheduling and performing his Work to avoid conflicts or interference in the Subcontractor's Work …." [*Id.* at 13]. The same provision states that, "[a]s soon as practical after execution of this Agreement, the Contractor shall provide the Subcontractor a copy of the estimated progress schedule of the Contractor's entire Work which the Contractor has prepared and submitted for Owner's and the Architect's information together with such additional scheduling details as will enable the Subcontractor to plan and perform his work properly." [*Id.*]. MRG was required to "notif[y] [CBS] promptly of any subsequent changes in the progress and the additional scheduling details." [*Id.*].

These provisions collectively give the impression that the Subcontractor would be promptly provided with a schedule that had already been approved by the Contractor, Architect, and Owner. In fact, that is what happened, with MRG providing CBS with the Adjusted Schedule following execution of the Subcontract. CBS's Director of Operations, Jeremy Smith, states that, "[a]lthough delays had already occurred, the Adjusted Schedule was an acceptable adjustment from MRG's representations to CBS about the Project schedule at the time CBS bid on the electrical work for the Project." [*Id.* at 2 (Smith Decl. ¶ 12)]. Further, Smith states that CBS "relied on the Adjusted Schedule to plan for and schedule its electrical work for the Project," and "to plan for and schedule CBS's work on other projects that it was performing during this same period." [*Id.* at 2-3 (Smith Decl. ¶ 13)]. Had CBS been called upon to perform the remaining

electrical work around the time called for by the Adjusted Schedule, CBS states it would have had the appropriate manpower, and would have been able, to perform the final two phases of its electrical work as promised. [*Id.* at 4 (Smith Decl. ¶ 25)].

Citing to the integration clause in the Subcontract, MRG contends that the Court cannot consider evidence about matters outside of the terms of the Subcontract, such as the Smith's declaration testimony. *See* [DE 28 at 1 ("[N]othing raised by CBS in its Response regarding its interpretation of the Subcontract is admissible because it is irrelevant and precluded by the Subcontract's integration clause.")]. But MRG's single-sentence argument--which does not even cite the contract provision MRG is referencing let alone any supporting case law--is deemed waived.[18] The Court also notes that MRG itself appears to rely on matters outside the Subcontract in support of its contractual interpretation arguments.[19]

In any event, to the extent that CBS offers extrinsic evidence for purposes other than to vary unambiguous terms of the Subcontract (such as to explain the meaning of ambiguous and/or implied contractual terms), the evidence would not be precluded by the Subcontract's integration clause. *See Judson Atkinson Candies, Inc. v. Kenray Assocs., Inc.*, 719 F.3d 635, 638–39 (7th Cir. 2013) ("where the parties to an agreement have

---

[18] *See Truelove v. Berryhill*, 753 Fed. Appx. 393, 397-98 (7th Cir. 2018) (argument "in a single-sentence footnote, without record support" deemed waived); *United States v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015) (single-sentence argument that is "unsupported …, bereft of citations, and completely undeveloped" is "an afterthought ... and is deemed waived" (internal quotation marks and citation omitted)).

[19] *See* [DE 21-2 at 1 (Plaintiff's Fact Statement, ¶ 3 ("At the time CBS entered into the subcontract it knew how long it had to do the work that it was required to do under the contract." (citing "Depo CBS, page 34, lines 14-19"))].

reduced the agreement to a written document and have included an integration clause

… the parol evidence rule prohibits courts from considering parol or extrinsic evidence

for the purpose of varying or adding to the terms of the written contract." (quoting

*Krieg v. Hieber*, 802 N.E.2d 938, 943 (Ind. Ct. App. 2004)); *Perrill v. Perrill*, 126 N.E.3d 834,

844 (Ind. Ct. App. 2019) ("The prohibition against the use of parol evidence is by no

means complete; in fact, parol evidence may be considered as long as it has not been

offered to vary the terms of the written contract."). The Court declines to delve further

into the issue as it has not been adequately addressed by the parties.

It is true, as MRG asserts, that the Subcontract overall indicates that the

approved schedule was subject to adjustments or changes. But the Subcontract provides

that MRG would "cooperate with the Subcontractor in scheduling and performing his

Work to avoid conflicts or interference in the Subcontractor's Work," and Smith states

that MRG did not consult with CBS, or seek CBS's input, before delivering the New

Schedule to CBS. [*Id.* (Smith Decl. ¶ 29)]. The Court is not convinced, at least on the

current briefing, by MRG's conclusory argument that MRG's duty to cooperate with

scheduling found in paragraph 11.2.2 only refers to avoiding conflicts or interference

from *other subcontractors* working on the Project at the same time. *See* [DE 28 at 2].

Several other provisions in the Subcontract specifically address conflict and

interference, imposing a duty on CBS to specifically avoid such conflicts with other

subcontractor's work, while also mentioning "areas of congestion."[20] Unlike these

---

[20] *See* [DE 4 at 9-10 (Subcontract ¶ 11.2.2 ("The Subcontractor shall supervise and direct its work, and shall
cooperate with the Contractor in scheduling and performing its Work to avoid conflict or interference
with the work of others."); *id.* at 10 (Subcontract ¶¶ 11.2.3 (duty regarding prompt submission of shop

provisions, the duty imposed on MRG in paragraph 11.2.2 to avoid conflicts and interference does not contain language referencing other subcontractors or "areas of congestion." MRG points out that paragraph 11.2.2 refers to "conflicts or interference in the Subcontractor's *Work*," meaning the electrical work required by the Subcontract (as opposed to CBS's other projects). But interference with CBS's ability to perform that Work might be caused not just by the work of other subcontractors on the Project but by scheduling changes that conflicted with CBS's commitments on its other projects. Indeed, paragraph 12.2.1 broadly references "scheduling details as will enable the Subcontractor to plan and perform his work properly."

The Court is also not convinced from MRG's rather meager arguments that the contract language about scheduling adjustments necessarily mandates that CBS agreed to perform according to any approved schedule no matter how drastically different it was from the original one.[21] MRG cites to the extension of time provision in the Subcontract as if that were CBS's only remedy for delays, which does not appear to be accurate. In fact, the Subcontract provides specific remedies for delay that MRG does not acknowledge, such as paragraph 11.10.1, referring to "damages for delay in accordance with the Contract Documents." [DE 4 at 12 (Subcontract ¶ 11.10.1)]. The "Contract Documents" include not only the Subcontract but the "Agreement between

drawings to avoid delay of Contractor's or other subcontractors' work), 11.2.7 (duty to perform work without damaging work of Contractor or other subcontractors); 11.2.8 (duty to cooperate with Contractor and other subcontractors whose work might affect the Subcontractor's Work, particularly in "areas of congestion"); 11.4.1 (similar to § 11.2.7); 11.4.2 (similar to § 11.2.8))].

[21] The Court is not saying the approximately three-month delay here was in fact a "drastic" change, as that issue has not been briefed. The Court is only responding to MRG's argument that CBS had no contractual rights regarding the scheduling of its electrical work.

17

the Owner and Contractor as amended from time to time." [*Id.* at 7 (Subcontract ¶ 1.1)]. The Subcontract states that CBS "shall have the benefit only of those rights, remedies, and redress against the Contractor which the Contractor, by the Contract Documents, has against the Owner, in so far as applicable to this Subcontract." [*Id.* at 9 (Subcontract, ¶ 11.1.1)]. But the Court cannot say what "rights, remedies, and redress" CBS might have pursuant to the terms of the agreement between MRG and the Owner because MRG has not included that agreement in the summary judgment record, notwithstanding its apparent relevance to the contractual interpretation question presented by its motion.

MRG also fails to address the meaning of the "time is of the essence" clause in the Subcontract. That clause states without limitation or further specificity that "[t]ime is of the essence of this Subcontract." [DE 4 at 7 (Subcontract ¶ 3.2)]. It thus appears to give both MRG and CBS rights under the Subcontract. Other courts have held that where a subcontract contains a "time is of the essence" clause but provides no specific deadline, "the relevant question is whether [performance occurred] within a reasonable timeframe." *Moorefield Constr., Inc. v. Cooley Constr., Inc.,* No. G062153, 2024 WL 58473, at *6 (Cal. Ct. App. Jan. 5, 2024). Applied here, that would mean that CBS can argue that it is contractually excused from performing if MRG's delay in scheduling CBS's electrical work was unreasonable. Unless the answer to that question is so clear that it

can be resolved as a matter of law, a decision on reasonableness likely cannot be reached on summary judgment.[22]

Finally, MRG argues based on generalities. For instance, it asserts that the Subcontract plainly contemplates "[a] dynamic schedule," and that "[a] construction project does not operate like a Swiss watch." [DE 28 at 2]. But accepting those propositions does not necessarily lead to MRG's conclusion that, "in [no] way, shape or form" did the Subcontract "permit [ ] CBS to be excused from performance due to a change in schedule during the term of the Subcontract." [DE 28 at 2 ]. In support of this interpretation of the Subcontract, MRG relies primarily on the absence of any contractual provision explicitly allowing CBS to object to the timing. But equally absent from the Subcontract is any explicit provision stating: (1) that CBS was required to perform regardless of any manner or length of delay in the work schedule; (2) that CBS's duty under paragraph 21 of Exhibit D to "do whatever is necessary to get back on schedule" meant CBS was required to perform when it had no available electricians; or (3) that CBS's sole and exclusive remedy for any delay, hindrance, interference or other similar event, was an extension in the time for performance of the Subcontractor's Work.[23]

---

[22] *See, e.g., Elda Arnhold & Byzantio, LLC v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 701 (7th Cir. 2022) (applying Illinois law but citing Restatement (Second) of Contracts § 241 cmt. a (1981), for the proposition that "the factfinder must take into account the totality of the circumstances and focus on the inherent justice of the matter," an analysis that "may not be made through a mechanical process," but includes "at a minimum … whether the breach defeated the bargained-for objective of the parties; whether the non-breaching party suffered disproportionate prejudice; and whether undue economic inefficiency and waste, or an unreasonable or unfair advantage would inure to the nonbreaching party").

[23] *Compare Asset Recovery Contracting, LLC v. Walsh Constr. Co. of Ill.*, 2012 IL App (1st) 101226, ¶ 21, 980 N.E.2d 708, 717 (2012) (where the contract provided: "It is expressly understood and agreed that the

At bottom, MRG's insistence that it had an absolute right to control the timing of CBS's performance of the electrical work strikes the Court as unilateral, extreme, and unsupported by the contractual terms and/or common usage in the trade. Is MRG arguing that it could delay the electrical work under the Subcontract by ten years and CBS would still be obligated to perform? Such an interpretation of the Subcontract would be inconsistent with the general rule of contract interpretation that "[w]here … the parties to a contract fix no time for the performance of an obligation created by the contract, they are presumed to have in mind a reasonable time." *Epperly v. Johnson*, 734 N.E.2d 1066, 1072 (Ind. Ct. App. 2000) (internal quotation marks and citation omitted); *see also Fraternal Order of Police Lodge No. 52 v. Civil City of Elkhart*, 551 N.E.2d 469, 472 (Ind. Ct. App. 1990) ("Where, as here, the parties to a contract fix no time for the performance of an obligation created by the contract, they are presumed to have in mind a reasonable time.").

This principle has been applied specifically to construction contracts. *See, e.g., Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1007-08 (2d Cir. 1991) ("Under New Yok law, each party to a construction contract impliedly agrees not to hinder or obstruct [the other's] performance," and "[e]xculpatory clauses" limiting that implied agreement "are strictly construed against the party seeking an exemption" (internal quotation marks and citation omitted)); *So. Fireproofing Co. v. R.F. Ball Constr. Co.*, 334 F.2d 122, 126, 128 (8th Cir. 1964) (while the subcontract's terms of indefiniteness

---

Subcontractor's sole and exclusive remedy for any delay, hindrance, interference or other similar event shall be an extension in the time for performance of the Subcontractor's Work.")

fell "far short of any date assurance to [subcontractor] and of any time guarantee," "[a] standard of 'within the bounds of reason'" nonetheless applied).[24] For instance, in *J.J. Brown Co. v. J.L. Simmons Co.*, 2 Ill. App. 2d 132, 118 N.E.2d 781 (1954), the court held that a contractual provision giving the general contractor "the right to direct the sequence or general progress of work d[id] not release it from liability for delay" under the implied rule of reasonableness. *Id.* at 140, 118 N.E.2d at 785. The court held that "[t]he extension provision [was] likewise no defense. It purports a benefit to plaintiff, and constitutes no limitation on its right to treat the contract as broken[.]" *Id.*; *see also Burgess Constr. Co. v. M. Morrin & Son Co.*, 526 F.2d 108, 114 (10th Cir. 1975) (extension of time clause "does not necessarily provide an exemption …. for [the general contractor's] delay"). Assuming a rule of reasonableness applies, "[w]hat constitutes a reasonable time depends on the subject matter of the contract, the circumstances attending performance of the contract, and the situation of the parties to the contract." *Epperly*, 734 N.E.2d at 1072.

---

[24] *See also United States ex rel. Quality Tr., Inc. v. Cajun Contractors, Inc.*, 486 F. Supp. 2d 1255, 1268 (D. Kan. Apr. 4, 2007) ("[T]hat the subcontract is silent as to when [the subcontractor's] performance would begin does not bar [the subcontractor] from suing [the contractor] for breaching an implied obligation to not delay or hinder the plaintiff's performance of the subcontract," even though the subcontractor admitted that it "entered the subcontract understanding that it did not specify a commencement date, time frame, or time limit for its performance."); *Blake Const. Co. v. C. J. Coakley Co.*, 431 A.2d 569, 576–77 (D.C. 1981) (rejecting arguments that "the unambiguous contract terms must prevail over any implied duties on [contractor's] part to schedule work to suit [subcontractor's] convenience and that [subcontractor] breached the subcontract by refusing to complete the job when ordered to carry out the [work]"; holding instead that there is an "implicit dut[y]" between contracting parties "not to prevent performance by the other party," and that, because the contractor breached that duty, the subcontractor "acted properly in discontinuing performance under the subcontract"); *cf. John E. Gregory & Son, Inc. v. A. Guenther & Sons Co.*, 147 Wis. 2d 298, 306 n.1, 432 N.W.2d 584, 587 n.1 (1988) (noting that "most states … have concluded that delay not contemplated by the parties is an exception to the general rule of the enforceability of 'no damage for delay' clauses).

Indiana courts "look at the contract as a whole and accept an interpretation of the contract that harmonizes all its provisions." *Berg*, 170 N.E.3d at 231 (internal quotation marks and citations omitted)). They construe contracts "so as to not render any words, phrases, or terms ineffective or meaningless," and conclude that "a contract is ambiguous if reasonable people would find it subject to more than one interpretation." *Id.* (internal quotation marks and citations omitted). In ignoring certain provisions of the Subcontract, and only focusing on the ones that support its arguments, MRG's analysis of what it claims are the unambiguous terms of the Subcontract obviously does not take into account the contract as a whole. This is not to say that the contract construed as a whole would excuse CBS from performing due to MRG's delay. Rather, the Court's discussion is intended to show only that MRG's "[u]nderinclusive and skeletal presentation []"[25] is insufficient for the Court to rule on its motion for partial summary judgment. In many respects, CBS's opposition to MRG's motion for partial summary judgment is similarly deficient. But MRG bears the burden of first coming forward with sufficient evidence in support of its motion before CBS's burden in opposing the motion is triggered. Accordingly, the Court concludes that MRG's vague briefing fails to meet its burden of showing that it is entitled to partial summary judgment on the issue of CBS's liability under the contract.

---

[25] *See Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006) (holding that undeveloped, perfunctory or unsupported, arguments "impermissibly shift the responsibility to the court to do the lawyer's work and to explicate the arguments that the briefs have left undeveloped. … [S]uch presentations sap the time of judges, forcing parties with comprehensively briefed disputes to wait in a longer queue and condemning them to receive less judicial attention when their cases finally are heard."(internal quotation marks and citations omitted)).

The motion [DE 21] therefore is denied.

### 3.    Amount in controversy requirement

As a final matter, the Court returns to the question of damages. Having examined that issue more closely, it has become apparent that the Court's subject matter jurisdiction, which is asserted pursuant to the diversity statute, 28 U.S.C. § 1332, may be called into question. The amended complaint only makes the conclusory allegation that MRG "has been damaged in an amount in excess of $75,000.00 by Subcontractor's failure to comply with its obligations under the Contract." [DE 4 ¶ 14]. There is no explanation or details concerning the nature of those damages. The Seventh Circuit "generally treat[s] the amount-in-controversy threshold as a 'pleading requirement.'" *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 732 (7th Cir. 2021) (quoting *Blomberg v. Serv. Corp., Int'l*, 639 F.3d 761, 763 (7th Cir. 2011)). Thus, a conclusory allegation stating that the amount in controversy requirement is satisfied or that more than $75,000 is at stake, is not sufficient without allegations to render the conclusory allegation plausible. *Id.*; *see, e.g.*, *Cellucci v. O'Leary*, No. 19-CV-2752 (VEC), 2021 WL 242806, at *2 (S.D.N.Y. Jan. 25, 2021) (citing cases).

In its original answer to the amended complaint, CBS denied the allegation that "[t]his Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000.00 and Contractor and the sole member of Subcontractor are of different state citizenship." *See* [DE 8 ¶ 6]. Because CBS simultaneously admitted or pleaded it was without knowledge concerning the relevant facts as to the parties' citizenship, *see* [*id.* ¶¶ 1-3], the Court assumes that its intent was to

23

deny the amount in controversy aspect of the subject matter jurisdiction allegation. Following this denial, CBS and MRG jointly filed a Report of Parties' Planning Meeting stating that "[t]he parties agree that the citizenship of the parties and the amount in dispute create diversity jurisdiction." [DE 12 ¶ 2]. Yet *after* filing this report, CBS filed an amended answer to the amended complaint, in which it once again *denied* the jurisdictional allegation of the amended complaint. *See* [DE 14, ¶ 6].

"[N]ot only may the federal courts police subject-matter jurisdiction *sua sponte*, they must." *Hays v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2022); *see also Sykes v. Cook Inc.*, 72 F.4th 195 (2023) (vacating district court's grant of summary judgment in diversity case and directing that the complaint be dismissed because of the absence of $75,000 in controversy). Given the Court's duty to assure itself of jurisdiction, and the lack of a plausible basis in the amended complaint for finding that the amount in controversy requirement has been satisfied, the Court will require MRG to specify its damages in a more concrete way that will allow the Court to assess whether its claims against CBS put into controversy an amount greater than $75,000 exclusive of interest and costs.

### III. Conclusion

For the foregoing reasons, the Court:

(1)    **DENIES** Plaintiff's Motion For [Partial] Summary Judgment **[DE 21]**;

(2)    **ORDERS** Plaintiff to file a supplemental jurisdictional statement on or before **May 22, 2024**, setting forth a plausible factual basis for its allegation that the

amended complaint puts into controversy more than $75,000.00 exclusive of interests and costs; and

(3)    **SCHEDULES** this matter for a status hearing on **May 29, 2024, at 11:45 A.M.**, to determine whether it is appropriate to proceed with the scheduling of this matter for trial or take other action with respect to this matter. To join the telephonic status conference, the parties should call **833-568-8864**. When prompted, the parties should enter Meeting ID: **160 4237 7854#**, push # again to skip Participant ID, and then enter the following Passcode: **356255**.

**SO ORDERED** this 8th day of May 2024.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge